# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CT-00556-SCT

*SHELIA DUPREE, INDIVIDUALLY, AND AS
CONSERVATOR OF THE PERSON AND ESTATE
OF ANNIE SANDERS*

*v.*

*PLANTATION POINTE, L.P. d/b/a THE WINDSOR
PLACE*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/2002 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TYLVESTER OTIS GOSS |
| | CONSTANCE SLAUGHTER HARVEY |
| ATTORNEYS FOR APPELLEE: | JAMES P. STREETMAN, III |
| | BRIAN DOUGLAS MAYO |
| | WADE G. MANOR |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART; THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED - 12/09/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Shelia Dupree sued Plantation Pointe, L.P. d/b/a The Windsor Place (Windsor Place),

individually and on the behalf of her mother, Annie Sanders, after Sanders was sexually

assaulted at Windsor Place nursing home, a business of Plantation Pointe. The trial court granted a directed verdict on Dupree's individual claim for mental and emotional damages. A jury verdict was returned in favor of Windsor Place on the remaining claims, and the trial court entered judgment for Windsor Place. After denial of the Dupree's motion for a judgment notwithstanding the verdict and motion for new trial, Dupree appealed.

¶2.     Dupree raised three issues before the Court of Appeals:

I.      The Trial Court Erred in Denying the Motion for Judgment Notwithstanding the Verdict and in the Alternate Motion for a New Trial;
II.     The Trial Court Failed to Properly Instruct the Jury; and
III.    The Court Erred in Excluding Testimony Concerning Mental and Emotional Damages and by Granting a Directed Verdict on the Issue.

¶3.     A divided Court of Appeals affirmed in part, reversed in part and remanded in part the circuit court's judgment. *Dupree v. Plantation Pointe, L.P.*, 881 So. 2d 832 (Miss. Ct. App. 2003). The Court of Appeals affirmed the trial court's dismissal of Dupree's claim for mental and emotional damages. However, the Court of Appeals found that the trial court abused its discretion in denying Dupree's motion for a new trial on the remaining issues and reversed and remanded for a new trial on the remaining issues. The Court of Appeals declined to address the issue regarding jury instructions.

¶4.     Windsor Place filed for certiorari claiming that the Court of Appeals erred in reversing and remanding the case for a new trial. As will be discussed, this Court reverses that decision by the Court of Appeals and reinstates and affirms the judgment based on the verdict and affirms the trial court's decision to deny the motion for new trial.

**FACTS**

¶5.     Facts derived from the Court of Appeals opinion include:

2

¶2.     Annie Sanders, a seventy-six-year-old female, was a resident of Windsor Place. Plantation Pointe, the defendant in the instant case, does business as Windsor Place. Uncontradicted testimony showed that Sanders was totally dependant and bedridden. She was unable to take care of or defend herself or communicate. She entered Windsor Place as a resident on November 15, 1999.

¶3.     On December 2, 1999, Otis Duff, a seventy-eight-year-old male, who was another Windsor Place resident was discovered in Sanders' room. Duff was on top of Sanders with his pants down and penis exposed. Duff had spread Sanders' legs apart and was moving his hips in a rocking motion. Duff had [Sanders' arms pinned down].

¶4.     Duff had been admitted to Windsor Place on July 30, 1999. Duff was over six feet tall and weighed at least 170 pounds. During the early part of his stay at the Windsor Place, he had been temporarily moved to another facility due to his behavior. That facility was more secure and able to handle Duff. Sherry Davis, the nursing administrator for Windsor Place, testified that reports from Windsor Place showed Duff to be verbally and physically abusive to staff. Duff would try to kick and bite staff members.  He had at one point threatened to kill [. . .]staff members.

¶5.     Duff also tried to kiss some staff members and made crude references to sex and sexual activities on numerous occasions, including walking through the halls naked. On November 29, 1999, Duff made one such comment to a Windsor Place office worker [. . . .] Duff ended this remark by grabbing his penis and shaking it at her. Duff later made another similar comment to a dietary staff member.

¶6.     Duff was also known to have gone into other residents' rooms and wander the premises on numerous occasions. On November 18, 1999, Duff was found in another resident's room wearing only a shirt. Davis admitted that one could assume that if Duff would hurt the staff he would hurt residents.

¶7.     Davis' testimony is quite confusing. At one point she was asked:

> Q.     My question was would you agree with me that the Windsor Place at least failed Ms. Sanders as it relates to this particular policy to provide safeguard against any kind of harsh or abusive treatment?
> A.     I don't think that she received treatment, nor do I think that she was sexually abused at this point.

¶8.     Later Davis admitted that sexual abuse was not tolerated at Windsor Place and the nursing home failed to protect Sanders from a sexual assault.

¶9.     Davis testified that Windsor Place gave residents documents concerning dignity, respect, and safety.  Upon reading the following mission statement for Windsor Place, Davis admitted that the nursing home violated the statement as it related to Sanders:

> The facility is dedicated to offering to the public the finest in
> nursing and rehabilitation for the aged and convalescent. The

3

Windsor Place also provides activities involving pets, children, plants and volunteers to promote emotional and physical well-being.

¶10. And upon reading the following resident abuse policy for Windsor Place, Davis admitted that the nursing home violated the policy [. . .] as it related to Sanders:

It is the policy of this facility to report all incidents of resident abuse to appropriate State and federal officials or agencies: 1. Resident abuse, whether physical or mental, will not be tolerated. Resident abuse is reported to authorities governing our facility.

¶11. Dee DaCosta, a charge nurse at the Windsor Place who was working at the time of the attack, testified that Sanders was attacked by Duff. She also testified that she had reported the attack anonymously to the Attorney General's Office.

¶12. Debbie Porter and Kimberly Thompson, both certified nursing assistants working at the Windsor Place at the time of the attack, testified that they were told to clean Sanders after the attack. This was the nursing home policy for when residents had to be transported to a hospital. Both also testified as to the abusive nature of Duff. Thompson testified as to Duff's sexual advances made to staff.

¶13. Crystal Harris, a certified nursing assistant working at the Windsor Place at the time of the attack, testified as to the abusive nature of Duff, including sexual advances toward employees and residents.

¶14. Sandra Stewart, a licensed practical nurse at the Windsor Place who was working at the time of the attack, testified that she was the one who discovered Duff in Sanders' room. She also testified that Duff was known to have been combative toward staff.

¶15. Expert testimony was also presented. One of the plaintiff's experts testified as to the inappropriate measures the nursing home took in regard to Duff. Another expert testified as to Sanders' mental and emotional state, although he was unable to give precise damages because of her already diminished capacity.

¶16. Dupree filed suit in the Circuit Court of Lauderdale County on March 13, 2000. The claim filed on her mother's behalf alleged that Windsor Place had represented that quality care would be provided, specifically that no sexual abuse would occur. Dupree also claimed that she suffered mental and emotional distress when she learned of the assault.

¶17. Prior to trial, Plantation Pointe filed a motion in limine to exclude the testimony of mental and emotional distress of Dupree. The trial court granted the motion. The case was tried February 5 through February 7, 2002. At the conclusion of the plaintiff's case in chief, Plantation Pointe moved for a directed verdict on the issue of Dupree's mental and emotional damages. The motion was granted. At the conclusion of the trial, the judge refused to grant a jury instruction offered by the plaintiff that would allow the jury to consider

mental and emotional damages of Dupree. The jury returned a verdict, ten to two, in favor of Plantation Pointe. The plaintiff filed a motion for a judgment notwithstanding the verdict or in the alternate a new trial. The motion was denied. The plaintiff perfected the appeal.

*Dupree*, 881 So. 2d at 833-35.

## DISCUSSION

### I. J.N.O.V. and new trial.

¶6.     Following the verdict, Dupree moved for JNOV or in the alternative a new trial. Because the Court of Appeals reversed the trial court based on its decision to deny a new trial, this opinion focuses on the motion for a new trial as opposed to the denial of JNOV.

¶7.     Motions for a new trial are made pursuant to Rule 59. Trial courts have authority to grant a new trial, where, in the exercise of their sound discretion, they regard such a verdict as being contrary to the substantial weight of the evidence. *C & C Trucking Co. v. Smith*, 612 So. 2d 1092, 1099 (Miss. 1992). A denial of a request for new trial will be reversed only when such denial amounts to a abuse of that judge's discretion. *Maxwell v. Ill. Cent. Gulf R.R.*, 513 So. 2d 901, 908 (Miss. 1987). This Court "should give substantial weight, deference and respect to the decision of the trial judge in matters such as this." *C & C Trucking Co.*, 612 So.2d at 1099.

¶8.     In finding that the trial court abused its discretion in denying the motion for a new trial, the Court of Appeals stated:

> ¶20     It is apparent that the trial judge abused his discretion when he failed to grant a new trial. The testimony is uncontradicted. Sanders was a resident at the Windsor place. She was unable to care for or protect herself.
>
> ¶21     Duff was also a resident at the Windsor Place. He was known to wander into other resident's rooms. He was known to be abusive, both with physical

5

violence and crude sexual displays and comments. Uncontradicted testimony from current and former employees of the Windsor Place substantiate this.

¶22 Duff sexually assaulted Sanders in her room at the Windsor Place. The nursing home was to provide a safe residence for Sanders. The overwhelming weight of the evidence shows they were aware of the potential danger Duff posed and did not take action to prevent it. Davis admitted that if Windsor Place had taken some action in regard to the notice, the sexual assault on Sanders would not have occurred. It is for this reason we reverse and remand for a new trial on Sanders' claim.

*Dupree*, 881 So. 2d at 836.

¶9. The majority opinion by the Court of Appeals is flawed in its analysis and overlooks substantial evidence supporting the verdict. Specifically, it failed to consider the Department of Human Services' investigation into the incident. Further, it failed to note that Duff was a dementia patient. There was no mention of Windsor Place's limited authority in transferring problematic patients. Contrary to the conclusion of the Court of Appeals majority, much of the evidence was contradicted. Though reasonable people may disagree as to whether Windsor Place was negligent, in this instance a jury by a vote of ten to two found that it was not. As will be discussed, there was substantial evidence supporting the verdict.

¶10. We agree with Judge Griffis's separate opinion that there is nothing in the record that would indicate the jury did anything other than fulfill its sworn duty to resolve the disputes of fact. This duty includes determining whether Sanders carried her burden of proof by a preponderance of the evidence that Windsor Place was negligent or that damages were proximately caused by any negligent act. *Id.* at 837-38. Like Judge Griffis, this Court considers facts and discusses how the verdict was supported by the testimony. *See id.* at 838-40.

¶11. On December 2, 1999, an employee of Windsor Place found Duff in Sanders's room. Duff had his pants down and his penis out, and he was in the bed on top of Sanders moving his hips in an up and down motion. Ensuing medical examinations did not reveal that any penetration had occurred. There was no evidence that any sexual touching or rape occurred nor was there evidence of blood or discharge.

¶12. Sherry Davis, administrator of Windsor Place, testified that all residents of Windsor Place were protected to the best of the nursing home's ability and that it was not negligent in this instance. She testified that the incident was reported to the Attorney General's office pursuant to the Mississippi Vulnerable Adults Act. After an investigation, the Department of Health found that Windsor Place was not negligent in its treatment and protection of Sanders. The Court of Appeals majority opinion fails to discuss the fact that the investigation by the DHS supported the verdict.

¶13. Davis further testified regarding the duties owed to Duff and that it was not uncommon for Alzheimer's patients, like Duff, to talk and act in a sexually suggestive manner. She testified regarding the decision to allow Duff to remain at Windsor Place despite his behavior and that only a resident's family or treating physician could transfer a resident to another facility. *See* 42 C.F.R. § 483.40 (2004) (only a physician may admit an individual to another facility). She testified that Windsor Place sought to have Duff relocated and informed Duff's family regarding his behavior. However, Duff's family was waiting for a spot to open at the Veteran's hospital and thus took no action. Thus, at this point Windsor Place's options for transferring Duff elsewhere were limited.

¶14.    Dee DaCosta, a registered nurse, was on duty on the night of the incident. DaCosta initially reported the incident to the Attorney General's office. She testified that on the night of the incident, the nursing home was properly staffed and that no member of the nursing home staff did anything improper in the treatment of Sanders. She stated measures were taken to protect the residents from Duff. Further, she testified that only a doctor had the power to restrain or transfer Duff and that the doctors did not do so.

¶15.    Crystal Harris, a certified nurse's aide at Windsor Place, testified that Windsor Place did not ignore Duff in his care and supervision. Another CNA, Kimberly Thompson, testified that she provided more of her attention to Duff when he was combative and paid close attention to Sanders.

¶16.    Thompson and Sheila Glover, in-service coordinator for Windsor Place, testified that the nursing home did not deviate from the standard of care owed to Sanders. Glover testified that Windsor Place made several unsuccessful attempts to have Duff transferred. Like Davis, Glover testified regarding Windsor Place's limited authority to transfer Duff. Further, she testified regarding conversations between nursing staff and treating physicians regarding Duff's behavior.

¶17.    Sandra Stewart, a geriatric nurse for over twenty-two years, testified that Windsor Place provided appropriate care for both Sanders and Duff. She also recalled communicating with Duff's treating physicians regarding his behavior throughout his residency. She did not believe that anyone at Windsor Place was negligent in the care of Sanders, even in light of this incident.

8

¶18.   Kathleen Meyer testified as an expert witness for Sanders.  On cross-examination, she admitted that ordering the transfer of a resident is within the exclusive purview of the treating physician, not Windsor Place.  Meyers offered no testimony of proposed treatment that she believed would have prevented the incident.  She agreed that wandering in and out of other residents' rooms was a common characteristic of Alzheimer's and dementia patients, such as Duff.  Meyer stated that nursing homes were only allowed to restrain residents after those residents had met requirements outlined in state and federal regulations, which were not present here. *See* 42 C.F.R. § 483.13(a) (2004) (resident has a right to be free from any physical or chemical restraints).  She testified that the Windsor Place employees properly documented and reported Duff's behavior to the doctors.

¶19.   Dr. David Marion testified that he only observed Sanders on one occasion and that he did not review all of her medical records.  On cross-examination, Dr. Marion also stated: "I don't think anyone can say to a certainty how she was affected or unaffected by that particular event."

¶20.   Thompson and Debbie Porter testified that when they went into Sanders's room after the incident, Sanders appeared to be calm and not agitated, as if nothing unusual had occurred.

¶21.   No other evidence as to damages allegedly suffered by Sanders was presented. Dupree presented no evidence to establish that Sanders incurred a physical injury or that she even knew that the incident even occurred. There was no evidence of any physical injury, such as bleeding, discharge, bruising, cuts, scratches or scraping to the skin of Sanders.  There was no evidence of any sexual touching or penetration. Indeed, nothing was presented to establish that she was harmed or injured either mentally or physically by Duff's aberrant conduct.

¶22.    Based on the foregoing, the trial court did not abuse its discretion, and the jury verdict was supported by the evidence.   As to the elements of duty and breach, the testimony of Davis, DaCosta, Harris, Thompson and Stewart all supported the jury's verdict.   Each testified regarding the standard of care and the fact that Windsor Place had a duty to ensure a safe environment for its residents.   However, much of their testimony supported a finding that Windsor Place did not breach its duty.   Several testified regarding Windsor Place's lack of authority to transfer or discharge Duff.

¶23.    Duty and breach aside, there was no testimony supporting injury to Sanders.   As already stated, there was no physical evidence.   Thompson and Porter testified that Sanders was not conscious of the incident.   Only Dr. Marion testified further about the alleged injuries. However, he admitted that based on Sanders's limited capacity, he could not testify to a reasonable degree of medical certainty as to the effect of the incident on Sanders.

¶24.    Though there was evidence and testimony in favor of Dupree/Sanders, there was sufficient contradictory evidence and testimony to support the jury's verdict.   Accordingly, the trial court did not abuse its discretion.   A new trial may be granted where the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty instructions, or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice.   *Griffin v. Fletcher*, 362 So. 2d 594, 596 (Miss. 1978).   As there is no evidence in this record to support that any of the aforementioned occurred, the decision from the Court of Appeals must be reversed on this issue, as there was conflicting evidence presented by both sides and the great deference that this Court affords juries.

## II.  Jury instruction.

¶25.    In this case, Dupree alleges that the trial judge failed to properly instruct the jury by not giving the following instruction:

> You are instructed to return a verdict for the Plaintiffs and against the Defendants.

It is evident that what Dupree was seeking was a peremptory instruction. We find that in this case Dupree was not entitled to such an instruction.

¶26.    This Court's standard of review for the denial of a judgment notwithstanding the verdict, peremptory instructions, and directed verdict is stated as follows:

> [T]his Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

*Steele v. Inn of Vicksburg, Inc*., 697 So.2d 373, 376 (Miss. 1997). The comment to Rule 50, which provides for motions for a directed verdict and for judgment notwithstanding the verdict, states: "Rule 50 is a device for the court to enforce the rules of law by taking away from the jury cases in which the facts are sufficiently clear that the law requires a particular result." Miss. R. Civ. P. 50 cmt.

¶27.    Due to the fact that there were disputed facts of whether the defendant was negligent and whether the Plaintiff suffered damages, we cannot under these circumstances find that the trial court erred in refusing a peremptory instruction. Consequently, this issue is without merit.

11

### III.  Mental and emotional damages.

¶28.    In its discussion, the Court of Appeals noted that Dupree was not near the assault scene, and the facts in this case did not lend themselves to third person recovery.    Therefore, affirming the trial court's decision, the Court of Appeals concluded that Dupree was unable to recover damages for mental and emotional distress.    This Court finds no error in the Court of Appeals' analysis, and accordingly affirms.

### CONCLUSION

¶29.    For these reasons, we affirm in part and reverse in part the judgment of the Court of Appeals, and we reinstate and affirm the judgment of the Lauderdale County Circuit Court.

¶30.    **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART; AND THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND DICKINSON, JJ., CONCUR.  DIAZ AND GRAVES, JJ., NOT PARTICIPATING**.