# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01296-COA

**MISSISSIPPI VALLEY SILICA COMPANY, INC.**                    APPELLANT

v.

**DOROTHY BARNETT, INDIVIDUALLY AND**                    APPELLEE
**AS WRONGFUL DEATH BENEFICIARY OF**
**HOWARD BARNETT, DECEASED, AND ON**
**BEHALF OF ALL WRONGFUL DEATH**
**BENEFICIARIES OF HOWARD BARNETT,**
**DECEASED**

DATE OF JUDGMENT:                11/28/2012
TRIAL JUDGE:                     HON. WINSTON L. KIDD
COURT FROM WHICH APPEALED:       HINDS COUNTY CIRCUIT COURT, FIRST
                                 JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:         JOHN D. COSMICH
                                 MICHAEL D. SIMMONS
                                 LAKEYSHA GREER ISAAC
ATTORNEYS FOR APPELLEE:          PATRICK MALOUF
                                 ROBERT ALLEN SMITH JR.
                                 TIMOTHY W. PORTER
                                 JOHN TIMOTHY GIVENS
                                 DAVID NEIL MCCARTY
NATURE OF THE CASE:              CIVIL - PERSONAL INJURY
TRIAL COURT DISPOSITION:         ENTERED JUDGMENT IN FAVOR OF
                                 APPELLEE FOR $1,095,000, INCLUDING
                                 $500,000 IN PUNITIVE DAMAGES, PLUS
                                 EIGHT PERCENT POST-JUDGMENT
                                 INTEREST, FOLLOWING JURY VERDICT
                                 IN FAVOR OF APPELLEE; AND
                                 AWARDED ATTORNEYS' FEES OF
                                 $212,312.50, PLUS POST-AWARD
                                 INTEREST OF EIGHT PERCENT
DISPOSITION:                     AFFIRMED IN PART AND VACATED AND
                                 REMANDED IN PART - 08/23/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.     From about 1960 to 1970, Howard Barnett worked for Mississippi Steel and Iron Company (MSIC) approximately forty to sixty-five feet away from sandblasting operations. Howard and a coworker both testified that silica sand supplied by Mississippi Valley Silica Company (Valley) was one of two brands of sand used in the sandblasting. They also testified that their work conditions were extremely dusty due to the nearby sandblasting operations. Howard was eventually diagnosed with silicosis, and he filed suit against Valley and other defendants, alleging that his disease was caused by his exposure to silica at MSIC. Howard alleged that Valley's sand was defective because it failed to provide adequate warnings and instructions regarding the dangers of silica. Howard passed away after he filed suit, and his wife, Dorothy Barnett, was substituted as the plaintiff in her individual capacity and on behalf of all of Howard's wrongful death heirs.

¶2.     The case eventually proceeded to trial against Valley only, and the jury returned a verdict in favor of Dorothy. The jury found that Dorothy had proven both economic and noneconomic damages and assigned Valley thirty-five percent fault for Howard's injuries. The trial court then submitted the issue of punitive damages to the jury, and the jury returned a verdict for punitive damages in the amount of $500,000. After judgment was entered on the verdict, the trial court also awarded Dorothy attorneys' fees. The trial court denied Valley's post-trial motions for judgment notwithstanding the verdict (JNOV) or a new trial and to alter or amend the judgment, and Valley appealed.

2

¶3. On appeal, Valley raises a number of issues, which may be restated as follows: (1) whether the judgment must be reversed and rendered because Dorothy never opened an estate and lacks "standing" to recover "survival damages" in her individual capacity or as a wrongful death heir; (2) whether Howard's/Dorothy's claim was barred by the applicable statute of limitations; (3) whether the trial court erred by instructing the jury that Valley had a duty to provide warnings to persons who might "reasonably be expected to be in the vicinity of the product's probable use and to be endangered by it if defective"; (4) whether Valley is entitled to JNOV or a new trial because Dorothy failed to prove that Howard was exposed to Valley sand or harmful levels of silica or that Valley breached its duty to warn; (5) whether the trial court erred by submitting the issue of punitive damages to the jury; (6) whether the statutory cap on punitive damages required the trial court to remit punitive damages to $0; (7) whether the trial court misapplied the apportionment statute and the statutory cap on noneconomic damages; and (8) whether the trial court's award of attorneys' fees was an abuse of discretion. We find no reversible error with respect to the first seven issues and therefore affirm the circuit court's judgment in favor of Dorothy for actual and punitive damages. However, we conclude that the trial court abused its discretion by awarding Dorothy $212,312.50 in attorneys' fees without any supporting findings of fact or conclusions of law. We therefore vacate and remand the award of attorneys' fees for redetermination based on appropriate findings and conclusions.

## FACTS AND PROCEDURAL HISTORY

¶4. Howard Barnett worked for MSIC for thirty years. From about 1960 to 1970, Howard

3

worked in a covered area of MSIC's facility on High Street in Jackson as a saw operator and crane operator. During that time, he worked approximately forty to sixty-five feet away from sandblasting operations. Howard and one of his former coworkers, Lee Burch, testified that on a daily basis, their workspace was extremely dusty because dust from the sandblasting operations carried easily through the air. Howard testified that he "ate a lot of sand" while working at MSIC during this decade and that the "sand was rough up there" even when he operated a crane. The sandblasting created enough dust that MSIC's neighbor complained about it. Howard and Burch both testified that they observed bags of silica sand manufactured by Valley and Southern Silica being used in MSIC's sandblasting operations.

¶5.    After Howard retired, he developed significant pulmonary issues and other health problems. His family practitioner, Dr. Charles Pruitt, initially diagnosed Howard as suffering from chronic obstructive pulmonary disease (COPD) and treated him accordingly. However, as Howard's pulmonary health worsened, Dr. Pruitt eventually referred him to Dr. Julian Rose, a pulmonologist. Dr. Rose treated Howard for several years and eventually diagnosed him with silicosis. Howard passed away in February 2011.

¶6.    Prior to his death, Howard filed the instant lawsuit against Valley and other defendants. Howard's complaint alleged that his lung injuries were caused by exposure to silica and that Valley's sand was defective because it failed to contain adequate warnings of the dangers of silica. *See* Miss. Code Ann. § 11-1-63(a) (Rev. 2014). Certain defendants subsequently filed motions for summary judgment, which Valley joined, arguing that Howard's injuries were discoverable in 2005, so the three-year statute of limitations had run

4

before he filed his lawsuit in 2010. However, the trial court denied these motions.

¶7. After Howard's death in February 2011, his attorneys filed a suggestion of death and motion to file an amended complaint to substitute his wife, Dorothy Barnett, as the plaintiff. The trial court granted the motion, and Dorothy filed an amended complaint, individually and on behalf of all of Howard's wrongful death beneficiaries. After other defendants were dismissed, the case eventually proceeded to an October 2012 jury trial against Valley only. Dorothy's only claim at trial was that Valley failed to provide adequate warnings of the dangers of silica. It was undisputed that Valley's sand was manufactured, marketed, and sold for use in sandblasting operations. It was also undisputed that there were no warning labels or safety instructions on Valley's sand during the relevant period.

¶8. The jury found in favor of Dorothy and apportioned fault thirty-five percent to Valley, thirty-five percent to Southern Silica, and thirty percent to MSIC. The jury also found economic damages of $165,615.73; noneconomic damages of $1,034,384.27; and damages for loss of consortium of $500,000. The trial court then submitted the issue of punitive damages to the jury, and the jury awarded $500,000 in punitive damages. The trial court entered judgment in favor of Dorothy for $1,095,000[1] plus costs and post-judgment interest.

¶9. After judgment was entered, Dorothy filed a motion for costs and attorneys' fees, and Valley filed a motion for JNOV or a new trial and a motion to alter or amend the judgment. In the latter motion, Valley argued that the judgment should be reduced pursuant to the statutory cap on noneconomic damages, Miss. Code Ann. § 11-1-60(2)(b) (Rev. 2014), and

---

[1] This amount consisted of thirty-five percent of the $1,700,000 in total compensatory damages found by the jury plus the $500,000 award of punitive damages.

that the statutory cap on punitive damages, Miss. Code Ann. § 11-1-65(3)(a) (Rev. 2014), precluded any award of punitive damages. The trial court denied Valley's motions and later awarded Dorothy attorneys' fees in the amount of $212,312.50.

¶10. Valley filed a timely notice of appeal from the final judgment of the circuit court. Additional facts and procedural history are discussed below in connection with the various issues raised by Valley on appeal.

## DISCUSSION

¶11. The issues raised by Valley on appeal are set out above in paragraph 3. We address these issues in turn below.

### I. *The absence of an estate does not require reversal.*

¶12. "The wrongful death statute allows the statutory heirs to recover damages for the defendant's wrongful, *lethal* conduct." *In re Estate of England*, 846 So. 2d 1060, 1068 (¶23) (Miss. Ct. App. 2003) (citing Miss. Code Ann. § 11-7-13 (Supp. 2002)). Therefore, "[t]o be entitled to recovery, the wrongful death plaintiff must prove that the wrongful conduct proximately caused the death." *Id.* If the wrongful death plaintiff meets this burden, then "any damages for personal injuries suffered by the decedent during [his] lifetime are [also] recoverable in the wrongful death suit." *Id.* at (¶25). However, if it is *not* proven that the defendant's wrongful conduct proximately caused the decedent's death, "there [can] be no recovery for the heirs under the wrongful death statute." *Id.* at (¶26). In that case, any right to recover damages for personal injuries that the decedent suffered during his lifetime would belong to the decedent's estate under the "survival statute." *Id.*; *see* Miss. Code Ann. § 91-7-

6

233 (Rev. 2013).

¶13.     Valley argues that the foregoing principles require us to reverse and render judgment in its favor.  Valley argues that the jury found that it "was not responsible for Howard's death," and therefore Dorothy lacked "standing" to recover any damages related to Howard's exposure to silica.  We disagree for three reasons, which we summarize briefly here and explain in more detail below.  *First*, a cursory reading of the jury's verdict shows that the jury actually found that Valley's "failure to warn . . . *was* a proximate cause of Howard Barnett's lung condition *and death*" (emphasis added), which directly contradicts the basic premise of Valley's argument.  This finding was inconsistent with another of the jury's findings, but if Valley intended to argue that one of two conflicting findings constituted a rejection of Dorothy's wrongful death claim, it should have requested clarification of the verdict.  We conclude that it waived this issue by failing to do so.

¶14.     *Second*, we conclude that Valley's objection is not a jurisdictional issue of "standing" but a real-party-in-interest objection, which may be waived if not timely asserted.  M.R.C.P. 17(a).  We conclude that Valley waived the issue by failing to raise it until after judgment had been entered on the verdict.

¶15.     *Third*, even if Valley had preserved the issue by making a timely objection in the trial court, we do not believe that Mississippi Supreme Court precedent requires us to reverse and render judgment in favor of Valley.  *See generally Methodist Hosp. of Hattiesburg Inc. v. Richardson*, 909 So. 2d 1066 (Miss. 2005) (*Richardson II*).  Rather, Rule 17(a) makes clear that "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the

7

real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." M.R.C.P. 17(a). Further, "such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." *Id.* Thus, at most, we would remand the case to afford Dorothy a "reasonable time" to open an estate and join it as a party. However, we need not do so in this case because we conclude that Valley has waived any real-party-in-interest objection.

> ### A.   The verdict form does <u>not</u> establish that the jury rejected Dorothy's wrongful death claim. The verdict form <u>is</u> internally inconsistent, but Valley waived any argument based on the inconsistency.

¶16.   Valley's threshold argument on appeal is that "[b]ecause the Hinds County jury expressly determined that . . . Valley was not responsible for Howard Barnett's death, there could be no recovery for his heirs under the wrongful death statute." Appellant's Br. at 8. Valley argues that, based on this supposed express determination by the jury, Dorothy lacks "standing" to recover survival damages. *Id.* In response, Dorothy seemingly accepts Valley's premise that "the jury did not find for [her] on her wrongful death claim," Appellee's Br. at 21, but she contends that Valley's argument is procedurally barred and misinterprets relevant precedents. A clear understanding of the jury's findings is necessary to determine the legal effect of the verdict. The jury answered the first five questions of the verdict form as follows:

VERDICT FORM

Answer "Yes" or "No" to all questions unless otherwise instructed.

8

1.     Do nine (9) or more of you find that Plaintiffs have proved by a preponderance of the evidence that silicosis or silica-related diseases were a substantial contributing cause of Howard Barnett's lung condition?

Yes ___✓___                              No _____

2.     Do nine (9) or more of you find that Plaintiffs have proved beyond a preponderance of the evidence that silicosis or silica-related diseases wer[e] a substantial contributing cause of Howard Barnett's death?

Yes _____                              No ___✓___

3.     Do nine (9) or more of you find that Plaintiffs have proved by a preponderance of the evidence that Howard Barnett had substantial exposure to respirable silica from sand supplied by Mississippi Valley Silica Company, Inc.?

Yes ___✓___                              No _____

If you[r] answer to the above question is "No," you may stop at this point and return this form into open Court as the verdict of the jury. If your answer to the above question is "Yes," you must proceed to the next question on this form.

4.     Do nine (9) or more of you find that Plaintiffs have proved by a preponderance of the evidence that a failure to warn on behalf of Mississippi Valley Silica Company, Inc. was a proximate cause of Howard Barnett's lung condition and death?

Yes ___✓___                              No _____

If you[r] answer to the above question is "No," you may stop at this point and return this form into open Court as the verdict of the jury. If your answer to the above question is "Yes," you must proceed to the next question on this form.

5.     What amount, if any, do nine (9) or more of you determine to be Howard Barnett's damages that were proximately caused and contributed to by exposure to respirable silica? Enter the amount on the line:

| | |
|---|---|
| Economic Damages | $ 165,615.73 |
| Non-Economic Damages (pain and suffering) | $ 1,034,384.27 |
| Wrongful Death | $ 0.00 |
| Loss of Consortium | $ 500,000.00 |
| TOTAL (add amounts above) | $ 1,700,000.00 |

¶17. Thus, in Question 4, the jury expressly found that Valley's "failure to warn . . . *was a proximate cause of Howard Barnett's lung condition *and death*" (emphasis added). The jury's answer to Question 4 directly contradicts Valley's assertion on appeal that the "jury expressly determined that . . . Valley was not responsible for Howard Barnett's death." Moreover, the jury's answer to Question 4 indicates that Dorothy *is* entitled to recover damages under the wrongful death statute, Miss. Code Ann. § 11-7-13 (Supp. 2015). "To be entitled to recovery, the wrongful death plaintiff must prove that the wrongful conduct proximately caused the death." *England*, 846 So. 2d at 1068 (¶23) (citing *Berryhill v. Nichols*, 171 Miss. 769, 773, 158 So. 470, 471 (1935)). Thus, the jury found that Dorothy had proven exactly what she needed to prove as a wrongful death plaintiff.

¶18. However, the jury's answer to Question 4 is inconsistent with its answer to Question 2. The jury's finding that Valley's failure to warn proximately caused Howard's death logically required a finding that silica-related disease was a substantial contributing cause of his death. Dorothy alleged that Valley's conduct caused Howard's silica-related disease, which caused his death. No alternative causal chain was alleged. If such disease proximately caused Howard's death, it necessarily was a substantial contributing cause.[2] Thus, the jury's

---

[2] *See Glenn v. Peoples*, 185 So. 3d 981, 986-87 (¶¶18-20) (Miss. 2015) (explaining that in a case involving multiple tortfeasors, proximate causation requires proof that the defendant's conduct "was a substantial factor in bringing about the harm").

10

finding in response to Question 2 that silica-related disease was not "a substantial contributing cause of Howard Barnett's death" is inconsistent with its finding in response to Question 4 that Valley's conduct *was* a proximate cause of Howard's death.[3]

¶19. Valley also emphasizes that the jury found no damages for "Wrongful Death," but we do not believe that anything can be inferred from that. The jury was instructed on the meaning of noneconomic damages,[4] but there were no specific instructions regarding damages for "Wrongful Death," damages for "Loss of Consortium," or "Economic Damages." Given that the jury found that Howard/Dorothy had suffered economic damages of $165,615.73 (for Howard's medical bills), pain-and-suffering damages of $1,034,384.27, and damages of $500,000 for loss of consortium, the fact that the jury made no additional finding of "Wrongful Death" damages—a concept that the jury instructions left undefined—does not imply a rejection of Dorothy's wrongful death claim. Indeed, since Dorothy did not put on evidence of any other economic damages, such as lost wages, it would appear that the jury separately found all types of wrongful death damages that are available under Mississippi law.[5] Therefore, nothing should be inferred from the fact that

[3] The completed verdict form returned by the jury suggests that the jury may have experienced some indecision in answering Question 2. The jury appears to have checked both "Yes" and "No" before finally settling on "No."

[4] The jury was instructed: "'Noneconomic damages' mean[s] subjective, nonmonetary damages arising from pain, suffering, mental anguish, emotional distress, physical impairment, loss of the enjoyment of loss [sic], loss of consortium, and other nonmonetary damages. The term 'noneconomic damages' does not include punitive damages."

[5] *See Laney v. Vance*, 112 So. 3d 1079, 1081 (¶6) (Miss. 2013) ("[D]amages [in a wrongful death action] are limited to: '(1) the present net cash value of the life expectancy

11

the jury did not award any additional "Wrongful Death" damages.

¶20. Nonetheless, the jury's answers to Question 2 and Question 4 are inconsistent. The question is whether that inconsistency entitles Valley to any relief given that neither party raised the issue before the jury was discharged. We addressed a similar issue in *Bartley-Rice v. State Farm Mutual Automobile Insurance*, 172 So. 3d 1227 (Miss. Ct. App. 2014), a negligence action involving an automobile accident. There, the jury returned a handwritten general "verdict for the [two] defendants" that stated that "the accident was unavoidable" and that "[t]he amount of damages [was] 0." *Id.* at 1228 (¶7) (brackets omitted). However, in a special verdict form the jury found that both the plaintiff and the defendants were guilty of negligence that proximately caused the plaintiff's injuries. *Id.* The special verdict form also apportioned sixty-five percent fault to the defendants. *Id.* The trial judge reviewed the handwritten general verdict and the special verdict form and told the attorneys that, in his opinion, the two were "not really contradictory" and "[t]he end result [was] the same." *Id.* at 1229 (¶12). Based on the judge's assurances, the parties agreed that it was unnecessary to ask the jury to clarify its verdict. *Id.* The judge then read both the handwritten general verdict and the special verdict form in open court and polled the jury. *Id.* at (¶13). Neither party objected or requested clarification, and the judge discharged the jury and entered judgment on the handwritten verdict for the defendants. *Id.* at (¶14). On appeal, the plaintiff argued that a new trial was required due to the "obvious conflict" between the handwritten

---

of the deceased, (2) the loss of the companionship and society of the decedent, (3) the pain and suffering of the decedent between the time of injury and death, and (4) punitive damages.'") (quoting *McGowan v. Estate of Wright*, 524 So. 2d 308, 311 (¶6) (Miss. 1988))).

12

verdict and the special verdict form, but this Court held that the issue was procedurally barred because it was not raised at trial. *See id.* at (¶¶15-16).

¶21. Similarly in this case, the verdict form and the jury's answers were read in open court. The trial judge then asked the parties if there were "[a]ny questions or comments," and there were none. The trial then proceeded to the punitive damages phase, and finally the jury was discharged. Only later did Valley assert that the jury's answer to Question 2 constituted a rejection of Dorothy's wrongful death claim. However, as explained above, Valley ignores the jury's finding in response to Question 4 that its wrongful conduct proximately caused Howard's death. Although the two answers are inconsistent, Valley never raised the issue or sought clarification of the verdict before the jury was discharged. Under the reasoning of *Bartley-Rice*, the issue is procedurally barred.

¶22. If Valley believed that an award of damages was precluded by one of two inconsistent findings in the verdict form, it was incumbent on Valley to seek clarification of the verdict while that was still possible. Having failed to do so, Valley cannot now challenge the judgment based on the one finding that is helpful to its position while ignoring the jury's finding in favor of Dorothy. In response to Question 4, the jury found that Valley's "failure to warn . . . was a proximate cause of Howard Barnett's lung condition and death." This is *exactly* what the law required Dorothy to prove in order to prevail on her wrongful death claim. *England*, 846 So. 2d at 1068 (¶23).

¶23. We also note that although Valley now argues that the jury's negative answer to Question 2 should have disposed of the entire case, the verdict form itself suggests otherwise.

13

The verdict form—to which the parties agreed—instructed the jurors that if they answered "Yes" to Question 3, then they were required to proceed to Question 4. On its face, this instruction applied regardless of the jury's answer to Question 2. Indeed, the structure of the verdict form effectively rendered moot the jury's answers to both Question 1 and Question 2. This probably was not what the parties had in mind, but it is what the verdict form said.

¶24. In summary, the fundamental premise of Valley's argument—that the "jury expressly determined that . . . Valley was not responsible for Howard Barnett's death"—is contradicted by the jury's verdict. The jury expressly found that Valley's wrongful conduct *was* a proximate cause of Howard's death, which is the essence of a statutory wrongful death claim. The jury's verdict was internally inconsistent, and one of its findings does support Valley's argument; however, Valley waived that argument by failing to seek clarification of the verdict before the jury was discharged.[6]

### B. Dorothy had standing to sue, and Valley waived any objection that she is not the real party in interest.

¶25. Valley's argument that Dorothy lacks "standing" to recover the damages that the jury awarded also conflates Dorothy's basic standing to sue with her ability to recover damages on a particular claim. Valley's real objection is that Dorothy, in her role as a wrongful death beneficiary, is not the real party in interest to recover the particular damages awarded to her because, in Valley's view, the jury found that its conduct was not a proximate cause of

---

[6] Even if Valley had preserved this issue, the appropriate relief would not be to reverse and render judgment in Valley's favor, as Valley argues on appeal. When a special verdict contains irreconcilable findings such that the intent of the jury cannot be discerned, it is not this Court's role to pick one finding and "disregard" the other. *First Bank of Sw. Miss. v. Bidwell*, 501 So. 2d 363, 366 (Miss. 1987). Rather, a new trial is required. *Id.*

Howard's death.[7]  The proper characterization of the issue is significant because "standing is a 'jurisdictional issue which may be raised by any party or the Court at any time,'" *Kirk v. Pope*, 973 So. 2d 981, 989 (¶22) (Miss. 2007) (quoting *City of Madison v. Bryan*, 763 So. 2d 162, 166 (Miss. 2000)), but a "real-party-in-interest defense must be timely and may be waived if tardily asserted," *id.* at 988 (¶21).  For the reasons discussed below, Dorothy had "standing," and Valley waived any claim that she was not the real party in interest with respect to the damages that she ultimately recovered.

¶26.    As our Supreme Court has explained, it is a mistake to "confuse standing to sue with the right to relief." *White Cypress Lakes Dev. Corp. v. Hertz*, 541 So. 2d 1031, 1034 (Miss. 1989).  Thus, the rule that a suit must be prosecuted in the name of the real party in interest, *see* M.R.C.P. 17(a), is distinct from and must not be confused with the jurisdictional doctrine of standing.  *See Kirk*, 973 So. 2d at 988-90 (¶¶20-29); *Richardson v. Edwards*, 127 F.3d 97, 99 (D.C. Cir. 1997) (applying Federal Rule of Civil Procedure 17(a)); *FDIC v. Bachman*, 894 F.2d 1233, 1235-36 (10th Cir. 1990) (same).[8]  "The law of standing is almost exclusively concerned with such public law questions as determinations of constitutionality and review of administrative or other governmental action." *Bachman*, 894 F.2d at 1235 (quoting Charles Alan Wright, *The Law of Federal Courts* § 13, at 60 (4th ed. 1983)).  In contrast, the

---

[7] As discussed in the previous section, the jury actually found that Valley's wrongful conduct *was* a proximate cause of Howard's death.  However, the discussion in this section accepts, solely for purposes of argument, Valley's contention that the jury found otherwise.

[8] "[W]ith the exception of slight changes or deletions, Rule 17(a) of the Mississippi Rules of Civil Procedure tracks the language from Rule 17(a) of the federal rules." *Kirk*, 973 So. 2d at 989 n.9.

question whether a private party is the proper plaintiff "to bring a particular cause of action" against another private party is generally a real-party-in-interest issue. *Id.* Indeed, the Mississippi Supreme Court previously addressed the issue raised by Valley—i.e., a wrongful death beneficiary's ability to recover on a "survival claim"—as a real-party-in-interest objection, not an issue of jurisdictional standing. *See Richardson II*, 909 So. 2d at 1072-73 (¶15).

¶27. With respect to Dorothy's standing to sue, "[i]t is well settled that Mississippi's standing requirements are quite liberal." *Hall v. City of Ridgeland*, 37 So. 3d 25, 33 (¶24) (Miss. 2010) (quotation marks omitted) (quoting *Burgess v. City of Gulfport*, 814 So. 2d 149, 152 (¶13) (Miss. 2002)). "In Mississippi, parties have standing to sue when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law." *In re City of Biloxi*, 113 So. 3d 565, 570 (¶13) (Miss. 2013) (quotation marks omitted) (quoting *Hall*, 37 So. 3d at 33 (¶24)). That is, the plaintiff has standing if her right "to assert a claim against a defendant [is] grounded in some legal right recognized by law, whether by statute or by common law." *SASS Muni-V LLC v. DeSoto Cty.*, 170 So. 3d 441, 446 (¶13) (Miss. 2015) (quoting *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 525 (¶38) (Miss. 2005)); *cf.* Miss. Const. art. 3, § 24 ("every person for an injury done him in his . . . person . . . shall have a remedy by due course of law"). "[S]tanding is to be determined as of the *commencement* of suit." *Delta Health Grp. Inc. v. Estate of Pope ex rel. Payne*, 995 So. 2d 123, 126 (¶13) (Miss. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 (1992)).

16

¶28.    In this case, there is no dispute that "as of the *commencement* of suit," *id.*, Howard's personal injury claim against Valley was grounded in a legal right recognized by law.  Nor is there any dispute that when Dorothy filed her amended complaint and was substituted as a plaintiff, she had a claim against Valley that was grounded in legal rights recognized by law.  As a wrongful death beneficiary, she had a claim against Valley under the wrongful death statute for any damages caused by Valley resulting from Howard's personal injuries and death.  *See England*, 846 So. 2d at 1068 (¶¶23-25).  Accordingly, Dorothy had standing to sue, and the circuit court had jurisdiction.

¶29.    Thus, Valley's objection does not go to Dorothy's standing in any jurisdictional sense.  Rather, Valley's argument is that although Dorothy originally had standing to pursue survival damages as part of a wrongful death claim, her standing evaporated the moment the jury returned a verdict that, according to Valley, found that Valley was not responsible for Howard's death.  That does not raise an issue of Dorothy's standing; rather, our Supreme Court has treated that argument as a real-party-in-interest objection.  *See Richardson II*, 909 So. 2d at 1072-73 (¶15).  Stated differently, it is a non-jurisdictional argument, which may be waived, that Dorothy was not entitled to recover on a particular type of claim.  *See Bachman*, 894 F.2d at 1235.

¶30.    Because it does not implicate the court's jurisdiction, "[a] real-party-in-interest defense must be timely and may be waived if tardily asserted." *Kirk*, 973 So. 2d at 988 (¶21) (citing *Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 483-84 (5th Cir. 2002); *Gogolin & Stelter v. Karn's Auto Imports Inc.*, 886 F.2d 100, 102 (5th Cir. 1989)).  Thus, in *Kirk*, the

17

Supreme Court had no difficulty concluding that the defendant waived its real-party-in-interest defense by failing to raise the issue until "after jury selection and just prior to the start of the trial." *Id.* at 989 (¶21).

¶31. Similarly, the United States Court of Appeals for the Fifth Circuit has held that a real-party-in-interest objection must be raised at a point when "joinder of the real party in interest remains 'practical and convenient.'" *In re Signal Int'l LLC*, 579 F.3d 478, 487 (5th Cir. 2009) (quoting *Rogers*, 308 F.3d at 484). The objection may not be held in reserve in a way that "hinders the 'goal of judicial efficiency' or manifests the defendant's intention to 'lay behind the log' in ambush." *Id.* at 488 (quoting *Rogers*, 308 F.3d at 484). Thus, the objection ordinarily will be deemed waived if it is raised for the first time shortly before or during trial. *See id.* at 488-89; *accord, e.g.*, *RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010); *Sun Ref. & Mktg. Co. v. Goldstein Oil Co.*, 801 F.2d 343, 345 (8th Cir. 1986).

¶32. Under *Kirk*, *supra*, and cases interpreting the parallel federal rule, Valley waived any real-party-in-interest objection in this case by failing to raise the issue until after judgment had been entered on the jury's verdict. Although Dorothy did not open an estate or specifically cite the survival statute,[9] her amended complaint expressly sought "1. Wrongful Death damages; 2. Damages entitled to the Estate; [and] 3. All Survival damages," as well as damages for "Pain and Suffering," "Mental Anguish," and other types of noneconomic damages suffered by Howard prior to his death. If Valley believed that Dorothy was not or might not be the proper party to recover some of these types of damages, then it should have

---

[9] Miss. Code Ann. § 91-7-233 (Rev. 2013).

18

raised an objection under Rule 17(a) at a time when it was still practical and convenient to join the real party in interest. Valley was not entitled to "lay behind the log" and raise this non-jurisdictional issue for the first time after the trial was concluded and judgment was entered. *Gogolin & Stelter*, 886 F.2d at 102. By failing to raise the issue until that point, Valley waived this defense.

### C. *Even if Valley had timely raised the issue, Dorothy would be entitled to a reasonable time to open an estate and join it as a party.*

¶33. For the two distinct reasons discussed above, Valley waived its argument that Dorothy lacks "standing." However, even if Valley had timely raised the issue, we would conclude that Dorothy would be entitled to "a reasonable time . . . after objection" to open an estate and join the estate as a party. M.R.C.P. 17(a). Because Valley's objection was not raised until after trial, Dorothy was never afforded the "reasonable time" to substitute that Rule 17(a) allows.

¶34. The dissent concludes that Valley has not waived the issue and that the time to substitute has passed. Relying primarily on this Court's decision in *England*, *supra*, the dissent maintains that we must reverse and render judgment for Valley. Although the Mississippi Supreme Court's decisions on this issue have been described as "confused," *Richardson II*, 909 So. 2d at 1075 (¶26) (Randolph, J., dissenting), its most recent decision indicates that Dorothy remains entitled to an opportunity to open an estate and join it as a party. For the reasons explained below, we conclude that relevant Supreme Court precedents would not require us to reverse and render judgment in favor of Valley even if Valley had

19

preserved the issue.

¶35.    In *Wilks v. American Tobacco Co.*, 680 So. 2d 839 (Miss. 1996), wrongful death heirs filed suit "exclusively" and "solely under [the] wrongful death statute," alleging that the defendant's cigarettes caused the decedent's lung cancer and death. *Id.* at 840, 842. The circuit court entered judgment in favor of the defendant on the plaintiffs' claim for "wrongful death after the jury determined that cigarette smoking was not the proximate cause of the decedent's death." *Id.* at 840. On appeal, the heirs argued "that even though the jury may have found [the decedent's] death unrelated to smoking, [they] were entitled to recover damages associated with [his] lung cancer and other smoking related illnesses suffered during his lifetime," "such as medical bills and . . . pain and suffering." *Id.* at 842. However, the Supreme Court rejected this argument and affirmed the judgment in favor of the defendant. The Court reasoned that there can be no recovery under the wrongful death statute unless the plaintiff proves that the defendant's conduct proximately caused the decedent's death. *Id.* at 843 (citing *Berryhill*, 171 Miss. at 471, 58 So. at 471). The Court further explained:

> [T]he heirs failed to alternatively base their cause of action on the survival statute at any point in time during this litigation. The complaint and trial proceeded exclusively under the wrongful death statute. [The defendant] cannot be blamed for the heirs' failure to alternatively pursue a cause of action for personal injury under Mississippi's survival statute.

*Id.*

¶36.    Several years later, in *England*, *supra*, this Court applied *Wilks*'s holding to a dispute in chancery court between wrongful death heirs and their decedent's ex-husband. *England*,

20

846 So. 2d at 1063-64 (¶¶4-9). Prior to her death, Betty England allegedly suffered injuries caused by the drug Rezulin. She hired a law firm to pursue a claim against Rezulin's manufacturer, and she executed a holographic instrument that purported to assign $1,000,000 of any recovery to her ex-husband. After Betty passed away, her ex-husband attempted to cause her estate to pursue a claim under the survival statute for injuries suffered during her lifetime, and he argued that he would be entitled to $1,000,000 of any recovery. However, Betty's wrongful death heirs argued that the wrongful death statute superseded any survival claim or rights of the ex-husband under the holographic instrument. *See id.* On appeal, this Court resolved the dispute as follows:

> [I]t is definite that, if Rezulin proximately caused Betty England's death, any damages for Betty's personal injuries from Rezulin must be recovered in an action for wrongful death, and could not be recovered by the estate under the survival statute.
>
> On the other hand, it is definite that if Rezulin did not proximately cause Betty's death, there could be no recovery for the heirs under the wrongful death statute. . . .
>
> . . . .
>
> *Wilks* makes clear that the proper resolution of this case is to allow the estate administrator to assert both a wrongful death action and a survival action against the manufacturers of Rezulin. If the jury finds that Rezulin caused Betty's death, then the estate is foreclosed from recovering in the survival action for any personal injuries caused by Rezulin; that recovery would belong solely to Betty's wrongful death heirs. If the jury finds that Rezulin did not cause Betty's death, the estate may recover for any personal injuries caused by Rezulin [under the survival statute]. If the estate recovers survival damages, then [Betty's ex-husband] could recover any amount from the estate to which he is entitled under the holographic instrument.

*Id.* at 1068-69 (¶¶25-26, 29) (citations omitted).

21

¶37. In *Richardson v. Methodist Hospital of Hattiesburg Inc.*, 807 So. 2d 1244 (Miss. 2002) (*Richardson I*), Linda Richardson, proceeding individually and on behalf of her mother's wrongful death heirs, alleged that the defendant hospital "caused or contributed to her mother's pain, suffering, and death by providing negligent and sub-standard nursing care." *Id.* at 1245 (¶4). The circuit court granted summary judgment for the hospital on the ground that Linda's expert was not qualified to testify regarding the applicable standard of care or causation. *See id.* at 1246, 1248 (¶¶8, 18). The Supreme Court affirmed with respect to Linda's claim for "wrongful death," *id.* at 1248 (¶19), but held that there was "a genuine issue of material fact requiring a trial on her separate cause of action for [her mother's] pain and suffering." *Id.* at 1247 (¶13). In reaching this conclusion, the Court specifically rejected the hospital's argument that *Wilks*'s holding barred Linda from recovering on such a claim. The Court reasoned that although "the survival statute [was] not specifically cited in [Linda's] complaint, the pleadings . . . delineate[d] two specific causes of action and [were] sufficient under our system of notice pleadings." *Id.*

¶38. On remand, the hospital moved to dismiss on the ground that only the decedent's estate (and not her wrongful death heirs) could pursue a survival action but no estate had been opened. *Richardson II*, 909 So. 2d at 1068 (¶3). The circuit court agreed and entered an order dismissing the case. *Id.* Three days later, Linda filed a petition in chancery court to open an estate for her mother, and the court granted her petition, appointed her as administrator, and authorized her to join the circuit court action on behalf of the estate. Linda then filed an amended complaint in circuit court in which she asserted a survival action

22

on behalf of the estate. *Id.* at (¶4). The hospital moved to dismiss, but the circuit court allowed the survival action to proceed. *Id.* at (¶5). On interlocutory appeal, the Supreme Court reaffirmed that *Wilks* did not bar Linda from pursuing a survival claim. *See id.* at 1071-72 (¶¶11-13). The Court also held that after the hospital's first objection that the wrongful death heirs were not the real parties in interest, the estate had been substituted within a reasonable time pursuant to Mississippi Rule of Civil Procedure 17(a), *id.* at 1072-73 (¶15), which provides as follows:

> **(a) Real Party in Interest.** Every action shall be prosecuted in the name of the real party in interest. . . . *No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest*; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

M.R.C.P. 17(a) (emphasis added).

¶39.    We acknowledge that it is somewhat difficult to reconcile *Richardson II* with *Wilks*.[10] However, in *Richardson II*, the Supreme Court directly addressed *Wilks* and explained, "Today's decision simply allows the pain and suffering element, which was specifically pleaded in the original complaint in the case sub judice, to remain viable." *Richardson II*, 909 So. 2d at 1072 (¶13). The survival claim in *Richardson* "remain[ed] viable" even though Linda Richardson initially proceeded individually and as a wrongful death heir, failed to cite the survival statute in her complaint, and failed to open an estate until after the circuit court had already granted summary judgment and the statute of limitations had run. *Id.* at 1071-72

---

[10] *See Richardson II*, 909 So. 2d at 1073-75 (¶¶20-27) (Randolph, J., dissenting) (stating that *Richardson I* and *Richardson II* have "confused our body of law in this area").

(¶¶11-13); *id.* at 1075 (¶25) (Randolph, J., dissenting). Even in those circumstances, she was entitled to an opportunity to open an estate and substitute it as the real party in interest. Apparently, she preserved her survival claim simply by pleading a "pain and suffering element . . . in the original complaint." *Richardson II*, 909 So. 2d at 1072 (¶13).[11]

¶40.    In the present case, Howard's original complaint and Dorothy's amended complaint both pled damages based on Howard's pain and suffering. Indeed, as noted above, Dorothy's amended complaint sought to recover, inter alia, "Damages entitled to the Estate," "All Survival damages," and damages for "Pain and Suffering" and "Mental Anguish." Under *Richardson II*, this was sufficient to preserve a survival claim even though Dorothy failed to open an estate or cite the survival statute in her amended complaint. Therefore, under *Richardson II*, Dorothy's claim for survival damages was not subject to dismissal on the ground that she was not the real party in interest. Even if Valley had timely asserted this objection, Dorothy would have been entitled to "a reasonable time . . . *after objection*" to open an estate and add the estate as a plaintiff. M.R.C.P. 17(a) (emphasis added); *Richardson II*, 909 So. 2d at 1072-73 (¶15). Therefore, even if the issue had been preserved, we would not reverse and render judgment on this basis. Rather, we would remand to give Dorothy a reasonable time to comply with Rule 17(a).[12]

---

[11] This Court's opinion in *England* describes the better procedure for pursuing wrongful death and survival damages in a case such as this, but *Richardson II* indicates that a plaintiff's failure to follow that procedure does not foreclose the plaintiff's opportunity to substitute the real party in interest within a reasonable time after objection.

[12] There is no bar to a post-judgment substitution under Rule 17(a). Such "post-judgment ratifications have been deemed valid by [the Mississippi Supreme Court] and other courts." *Kirk*, 973 So. 2d at 990 (¶29).

¶41. In summary, we conclude that Valley has waived any objection to Dorothy's "standing," which in reality is an objection that she is not the real party in interest. Moreover, even if Valley had preserved the issue, we would only remand the case to give Dorothy an opportunity to open an estate and join it as a party.

## II. Whether Howard filed suit within the applicable limitations period was an issue for determination by the jury.

¶42. Valley next argues that the circuit court should have granted its motion for summary judgment or its motion for JNOV because Howard filed suit after the statute of limitations had run. The applicable statute of limitations is three years, and because this case involves a "latent disease," the limitations period began to run when Howard "discovered, or by reasonable diligence should have discovered, [his] injury." Miss. Code Ann. § 15-1-49 (Rev. 2012). Valley joined a pretrial motion for summary judgment based on the statute of limitations, which was denied, but at trial Valley did not move for a directed verdict or request a jury instruction on this issue. Valley then re-urged the issue in its post-trial motion for JNOV or a new trial, but it did so under the heading "GROUNDS ON WHICH A NEW TRIAL IS WARRANTED." There, Valley briefly argued that "a new trial [was] warranted" because the court "erred by failing to grant [its pretrial summary judgment] motion." The manner in which this issue was raised in the court below complicates our review on appeal.

¶43. First, we will not review the circuit court's pretrial denial of summary judgment. Such a ruling is rendered moot and cannot be reviewed on appeal once a case proceeds to a trial on the merits. *Gibson v. Wright*, 870 So. 2d 1250, 1254 (¶8) (Miss. Ct. App. 2004) (citing *Black v. J.I. Case Co.*, 22 F.3d 568, 569-70 (5th Cir. 1994)); *accord Britton v. Am. Legion*

25

*Post 058*, 19 So. 3d 83, 84 (¶7) (Miss. Ct. App. 2008); l5B Charles Alan Wright et al.,

*Federal Practice and Procedure* § 3914.28, at 210-11 & n. 18 (2d ed. 1992 & Supp. 2016).

¶44.    When, as in this case, a circuit court has determined that a genuine factual dispute

concerning the application of the discovery rule precludes summary judgment, the defendant

should litigate the issue at trial, move for a directed verdict on that ground, and then request

appropriate jury instructions. *See generally Huss v. Gayden*, 991 So. 2d 162 (Miss. 2008).

Valley did not do so in this case.  It is also debatable whether Valley's post-trial motion for

JNOV or a new trial preserved the issue that it now seeks to raise on appeal.  It is true that

in Mississippi state court, a party may raise an issue in a post-trial motion for JNOV under

Mississippi Rule of Civil Procedure 50(b) even if it failed to raise the issue at trial in a

motion for a directed verdict under Rule 50(a).  *See New Hampshire Ins. v. Sid Smith &*

*Assocs. Inc.*, 610 So. 2d 340, 344 (Miss. 1992).[13]  However, Valley's post-trial motion quite

clearly raised the statute of limitations as a ground for a *new trial*, not JNOV.  Given the

manner in which Valley raised the issue post-trial, we easily could "conclude[] that [Valley]

is now procedurally barred from requesting this Court to review the legal sufficiency of the

evidence on appeal as [Valley actually] sought a new trial and not a [JNOV]."  *Harrison v.*

*McMillan*, 828 So. 2d 756, 764 (¶22) (Miss. 2002).

¶45.    Furthermore, before the circuit court, Valley argued that it was entitled to a new trial

because the court erred by denying its pretrial motion for summary judgment; however, as

---

[13] In federal court, in contrast, "[a] motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008).

26

we have explained just above, such a pretrial ruling becomes moot once the case proceeds to trial, so it would not be grounds for a new trial. Finally, the one statute-of-limitations-related argument that Valley seems to have preserved in the trial court simply does not correspond to the issue that it seeks to raise on appeal. In the trial court, Valley raised a claim that it was entitled to a new trial based on the statute of limitations, but in this Court it argues that it is entitled to judgment as a matter of law on that ground. Despite these various procedural difficulties, we will address the merits of Valley's argument.[14]

¶46.    In the circuit court, Valley took the position that Howard did not have silicosis or any other silica-related disease. Valley maintained that Howard suffered only from COPD, which Valley attributes to smoking, not silica. However, Valley also argues that if Howard did have a silica-related disease, then he discovered or should have discovered his injury in 2005 or no later than 2006. Accordingly, Valley argues that the statute of limitations had run before Howard filed suit on June 10, 2010. In support of this argument, Valley cites the following statement in Dr. Julian Rose's April 2005 notes: "silicosis suspect." Valley also cites the April 2005 records of Dr. Robert Evans, which noted that Howard had been "seen recently

---

[14] If we view the issue as whether Valley was entitled to JNOV, then we "consider the evidence in light most favorable to [Dorothy], giving [her] the benefit of all favorable inference[s] that may be reasonably drawn from the evidence," and we will reverse only if "the facts so considered point so overwhelmingly in favor of [Valley] that reasonable men could not have [returned] a . . . verdict" for Dorothy. *Coho Res. Inc. v. Chapman*, 913 So. 2d 899, 904 (¶12) (Miss. 2005) (quoting *Coho Res. Inc. v. McCarthy*, 829 So. 2d 1, 8-9 (¶12) (Miss. 2002)). "A new trial may be granted where the verdict is against the overwhelming weight of the evidence," but we "give substantial weight, deference, and respect to the decision of the trial judge," and we will reverse only if the trial judge's ruling "amounts to an abuse of that judge's discretion." *Id.* at 908 (¶28) (citing *Dupree v. Plantation Pointe L.P.*, 892 So. 2d 228, 232, 235 (Miss. 2004)).

by Dr. Julian Rose and evidently [a] question ha[d] been raised regarding silicosis." Finally, Valley points to the following statement in Dr. Rose's August 2006 treatment notes: "sandblasting in past." However, Dr. Rose testified that he was unable to diagnose Howard with silicosis prior to June 28, 2007, and no evidence was presented that a doctor told Howard that he had or might have silicosis prior to that time.

¶47. Our Supreme Court has held that when medical records or tests are "suggestive" of a particular illness but a diagnosis is not made until a later date, "the determination of the time at which [a plaintiff] knew or by reasonable diligence should have known of his illness . . . is a fact question which must be resolved by a jury." *Ridgway Lane & Assocs. Inc. v. Watson*, 189 So. 3d 626, 630 (¶15) (Miss. 2016) (citing *Phillips 66 Co. v. Lofton*, 94 So. 3d 1051, 1059 (Miss. 2012)). Thus, in *Watson*, the plaintiff filed suit more than three years after a radiology report raised the possibility that he had bronchiectasis but less than three years after an actual diagnosis was made, and the Court held that the date on which the limitations period began to run was a fact question for the jury. *Id.* In *Lofton*, the Court concluded that a CT scan showing evidence of pulmonary fibrosis was insufficient to trigger the statute of limitations given the plaintiff's testimony that he was not made aware that he had fibrosis until his doctor diagnosed the illness several years later. *See Lofton*, 94 So. 3d at 1059-60 (¶¶14-17). Finally, in *Schiro v. American Tobacco Co.*, 611 So. 2d 962 (Miss. 1992), the Court held that the statute of limitations began to run when the plaintiff, a former smoker, was diagnosed with lung "cancer, an injury connected with smoking." *Id.* at 965. The initial discovery of the mass that turned out to be cancerous was deemed insufficient to trigger the

28

statute. *Id.*

¶48.    We agree with Dorothy that the evidence in this case created a genuine issue of material fact with respect to the applicability of the statute of limitations. Under Mississippi law, notes in Howard's medical records suggesting the possibility of silicosis are insufficient to trigger the statute of limitations as a matter of law, and Dr. Julian Rose testified that he was first able to diagnose Howard with silicosis less than three years prior to the commencement of this lawsuit. Valley contends that Dr. Rose's testimony was not credible, but his credibility was an issue for the jury to decide. *See, e.g.*, *Jackson v. Griffin*, 390 So. 2d 287, 289 (Miss. 1980). Furthermore, there is no evidence in the record that any doctor told Howard that he had silicosis prior to Dr. Rose's diagnosis. On the record in this case, "the determination of the time at which [Howard] knew or by reasonable diligence should have known of his illness . . . [was] a fact question [to] be resolved by [the] jury." *Watson*, 189 So. 3d at 630 (¶15). Valley could have requested a jury determination on that issue, but it did not. Valley is not entitled to judgment as a matter of law or a new trial on this issue.

>   **III.    The trial court's instruction on Valley's duty was consistent with Mississippi Supreme Court precedent.**

¶49.    Valley next argues that the trial court committed reversible error in instructing the jury regarding a manufacturer's duty to warn. "The giving or refusal of jury instructions by a circuit court is reviewed under an abuse-of-discretion standard." *Howell v. Equip. Inc.*, 170 So. 3d 592, 599 (¶16) (Miss. Ct. App. 2014). "[T]his Court does not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed." *Mitchell v. Barnes*, 96 So. 3d 771, 775 (¶9) (Miss. Ct. App. 2012) (quoting *Burton ex rel.*

29

*Bradford v. Barnett*, 615 So. 2d 580, 583 (Miss. 1993)). "Defects in specific instructions do not require reversal where all instructions taken as a whole fairly—although not perfectly—announce the applicable primary rules of law." *Id.* (internal quotation marks omitted). "However, if those instructions do not fairly or adequately instruct the jury, we can and will reverse." *Id.*

¶50.   Valley specifically objects to the following instruction given by the trial court:

> Mississippi law imposes upon the manufacturer of a product the duty to warn anyone who may reasonably be expected to be in the vicinity of the product's probable use and to be endangered by it if defective. The manufacturer's duty to warn in Mississippi is non-delegable. Thus, the manufacturer's warning must be reasonably calculated to reach such persons and the presence of an intermediary party will not by itself relieve the manufacturer of its duty.

Valley argues that Mississippi law does not impose such a duty to warn "bystanders."

¶51.   However, as Dorothy points out, the trial court's instruction accurately reflects Mississippi Supreme Court precedent on this point. In *Swan v. I.P. Inc.*, 613 So. 2d 846 (Miss. 1993), the Supreme Court held:

> Lack of an adequate warning is a defect which makes a product unreasonably dangerous for strict liability purposes. This Court has extended this duty to bystanders, holding that the duty imposed by [section] 402A [of the Restatement (Second) of Torts] "exists in favor of anyone who may reasonably be expected to be in the vicinity of the product's probable use and to be endangered by it if it is defective."

*Id.* at 852 (quoting *Coca Cola Bottling Co. v. Reeves*, 486 So. 2d 374, 378 (Miss. 1986)) (citations omitted).

¶52.   Valley responds by arguing that *Swan* is no longer good law and has been superseded by the Mississippi Products Liability Act (MPLA), Miss. Code Ann. § 11-1-63, which was

originally enacted in 1993. Valley contends that the MPLA impliedly precludes recovery by a mere "bystander" because the statute consistently refers to a "user or consumer" of the product. *See id.* However, we read the statute's references to users and consumers as relevant to the question whether the product is defective—e.g., the knowledge of the product's ordinary users and consumers must be taken into account, *see id.* § 11-1-63(c)(i), (c)(ii), & (e)—not as a limitation on the parties who may sue for injuries caused by defective products. The trial court gave jury instructions that were consistent with these provisions of the MPLA. Moreover, even after the enactment of the MPLA, our Supreme Court has continued to describe "[p]roducts liability" law as providing a cause of action for "bystanders" who are injured by defective products. *R.J. Reynolds Tobacco Co. v. King*, 921 So. 2d 268, 271 (¶11) (Miss. 2005) (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 95, at 677 (5th ed. 1984)).

¶53. Read as a whole, the trial court's instructions simply recognized a duty to provide a reasonable warning concerning dangers of which the manufacturer knew or should have known to those persons "who may reasonably be expected to be in the vicinity of the product's probable use and to be endangered by it if defective." Furthermore, Howard was not a mere casual "bystander" in the sense of a random passerby on an isolated occasion; rather, he worked in close proximity to sandblasting for a decade and regularly observed Valley's silica sand in its original packaging. The trial court's instructions were consistent with the Supreme Court's decision in *Swan*, and because *Swan* has not been overruled, they were a fair statement of the law. Accordingly, the trial court did not err by giving the

31

instruction to which Valley objects.

### IV.    *Dorothy presented sufficient evidence to sustain the verdict.*

¶54.    Valley next argues that it is entitled to JNOV or a new trial because on multiple issues Dorothy's proof was insufficient or the jury's verdict was against the overwhelming weight of the evidence.[15]  Specifically, Valley argues that Dorothy failed to prove that Howard was exposed to any Valley sand, that he was exposed to harmful levels of silica from Valley's sand, or that Valley breached any duty to warn.  We address these arguments in turn below and conclude that, viewing the evidence in the light most favorable to Dorothy and granting all reasonable inferences in her favor, there was sufficient evidence to support the verdict. We also conclude that the trial court did not abuse its discretion in denying Valley's motion for a new trial.

### A.    *Dorothy presented sufficient evidence that Howard was exposed to Valley's sand.*

¶55.    Valley argues that Dorothy failed to prove that Valley supplied sand to MSIC because there was no evidence of sales from Valley to MSIC.  However, Howard and Burch both testified that sand supplied by Valley and Southern Silica was used regularly in MSIC's sandblasting operations.  The two men also identified the sandbags of those two companies. Citing *Mississippi Valley Silica Co. v. Reeves*, 141 So. 3d 377 (Miss. 2014), Valley argues that their testimony was insufficient to prove exposure to any significant amount of Valley sand.  However, in *Reeves*, the decedent "clearly had difficulty remembering" the names of any brand of sand used by his employer and "specifically remembered using Valley sand on

---

[15] For the applicable standards of review, see *supra* n.14.

only one occasion." *Id.* at 382-83 (¶17). One of the decedent's coworkers also testified, but he admitted on cross-examination "that he did not recall the name of the sand" to which the decedent would have been exposed. *Id.* at 383 (¶18). As the Supreme Court put it, *Reeves* was "not a case in which there was a dispute about how much sand Valley had sold to [the decedent's employer], or for how long. Rather, [the plaintiff] failed to show that Valley ever sold sand to [the employer], with the possible exception of [a] single bag . . . ." *Id.* at 383-84 (¶21). Here, in contrast, Howard and Burch gave straightforward testimony that Valley sand and Southern Silica sand were in regular use at MSIC's High Street facility. It was up to the jury to assess their credibility, *see Jackson*, 390 So. 2d at 289, and their testimony was sufficient to sustain the verdict on this point. Dorothy was not required to uncover decades-old invoices to prove her case.

### B. Dorothy presented sufficient evidence that Howard was exposed to harmful levels of respirable silica.

¶56. Valley next argues that even if there was sufficient proof of exposure to Valley sand, there was insufficient proof that Howard was exposed to harmful levels of respirable silica. However, Dr. Steve Haber, a certified B-reader[16] who testified as an expert in pulmonary diseases associated with silica exposure, testified that Howard had silicosis. Exposure to harmful levels of silica is a prerequisite to such a diagnosis. *See Mine Safety Appliance Co. v. Holmes*, 171 So. 3d 442, 451 (¶37) (Miss. 2015). Dr. Haber opined that Howard's

---

[16] "A B-reader is a doctor certified by [the National Institute for Occupational Health and Safety (NIOSH)] to identify the presence of asbestos- and silica-related disease precursors on chest x-rays." *Choctaw Inc. v. Campbell-Cherry-Harrison-Davis & Dove*, 965 So. 2d 1041, 1047 n.10 (Miss. 2007).

exposure to fine airborne silica particles from sandblasting—which occurred five days a week for a decade—was more than sufficient to cause silicosis. In addition, Dr. Vernon Rose, an industrial hygienist, opined that Howard was exposed to extremely high concentrations of respirable silica based on Howard's testimony that, for ten years, he worked for prolonged periods near sandblasting operations in conditions so dusty that he could taste sand and see the dust. Dr. Rose relied in part on the findings of a study of silica exposure levels at steel fabrication yards in Louisiana. Dr. Rose testified that the study found that persons employed in positions similar to Howard's were, on average, exposed to levels of respirable silica in excess of the maximum levels recommended as safe by OSHA, NIOSH, and the American Conference of Governmental Industrial Hygienists.

¶57. Valley argues that this evidence was insufficient as a matter of law because some of the conditions in the study on which Dr. Rose relied may have differed from Howard's work conditions at MSIC. For example, the precise distance between the sandblasting operations and the workers in the study is unclear. However, a plaintiff in a silica case "is not required to" "offer any direct evidence of the level of [his] exposure" and "may show an unsafe exposure or dose through circumstantial evidence, so long as that evidence is reliable." *Id.* at (¶34). In *Holmes*, the Supreme Court held that the plaintiff's evidence on this issue was sufficient to survive a motion for JNOV because he "offered evidence of extremely dusty work conditions"; that he was exposed to concrete dust that contained silica, "though no one [knew] exact[ly]" how much; and that he "suffer[ed] from silicosis, an injury known to be caused by silica overexposure." *Id.* at (¶35). The Court further explained that the plaintiff

34

"offered testimony, though not uncontroverted, that his x-rays were consistent with someone with silicosis, which, by its very definition, requires a sufficient dose of silica." *Id.* at (¶37). Dr. Rose also testified in *Holmes*, and there he relied in part on a study suggesting that it was more likely than not that the plaintiff's work did *not* result in overexposure to silica. *Id.* at (¶39). However, the Supreme Court held that the study's limitations did not defeat the plaintiff's claim because his "substantial" "circumstantial evidence" of overexposure—his "dusty work conditions . . . , exposure to concrete dust on multiple occasions, his diagnosis of silicosis, etc."—was sufficient to survive the defendant's motion for JNOV. *Id.*

¶58.    *Holmes* is on point, as it is not meaningfully distinguishable from the present case. Like the plaintiff in *Holmes*, there was credible evidence that Howard's work conditions were extremely dusty, that he was exposed to silica, and that he ultimately developed silicosis. As in *Holmes*, Valley raised questions about the study on which Dr. Rose relied, but given the "substantial" "circumstantial evidence" presented at trial, those questions were a matter for the jury to consider, not a ground for judgment as a matter of law or a new trial. *Id.* Accordingly, we conclude that the trial judge properly denied Valley's motion for JNOV or a new trial on this issue.

### C.    *Dorothy presented sufficient evidence that Valley breached its duty to provide adequate warnings.*

¶59.    Finally, Valley argues that although its sandbags contained no warning labels during the relevant period, there was insufficient evidence that it breached its duty to provide "adequate warnings or instructions." Miss. Code Ann. § 11-1-63(a)(i)(2). Valley primarily argues that there was no proof that it "knew or in light of reasonably available knowledge

35

should have known about the danger that caused the damage for which recovery is sought."

*Id.* § 11-1-63(c)(i). In Valley's view, there was no evidence that it should have known during the 1960s that sandblasting operations could expose "bystanders" such as Howard to harmful levels of respirable silica.[17]

¶60. In response, Dorothy first points to a letter written by Valley's former president and part owner, Frank Bogran, which stated in part:

> From 1960 to 1976, I was part owner and President of [Valley]. We were primarily engaged in the processing and sale of sandblasting sand . . . . During this period of time all of us in the industry were aware of the health hazards inherent in the sandblasting industry. . . . Any responsible executive in this industry would have known—should have known—that many European countries had banned the use of silica sand as early as 1949 . . . .

Bogran wrote this letter in 1990, fourteen years after he left his employment with Valley. In deposition testimony read at trial, Bogran claimed that he did not became aware that sandblasting could cause silicosis until 1972. Dorothy also relies on the testimony of Dr. Vernon Rose, who stated that silica exposures related to sandblasting had been a known cause of silicosis for many decades prior to Howard's exposures in the 1960s. However, Dr. Rose admitted on cross-examination that studies he cited regarding "bystander exposure" to silica were not published until the 1970s, after Howard's period of exposure.

¶61. On appeal, Valley maintains that the Bogran letter was an unsworn prior inconsistent statement that was admissible for impeachment purposes only, not as substantive evidence. *See* M.R.E. 613; *Karpinsky v. Am. Nat'l Ins.*, 109 So. 3d 84, 91 (¶23) (Miss. 2013); *Bailey*

---

[17] Valley also argues that it owed no duty at all to "bystanders." We have addressed this argument in Part III, *supra*.

*v. State*, 952 So. 2d 225, 237 (¶27) (Miss. Ct. App. 2006). However, the Bogran letter was admitted into evidence at trial without discussion or any on-the-record objection or request for a limiting instruction; therefore, it is unclear that the letter was admitted solely for impeachment.[18] Moreover, the Bogran letter was actually admitted into evidence, even though Bogran admitted in his deposition testimony that he made the statements in the letter. "It is well-settled that, where a non-party witness admits to having made a prior inconsistent statement, the statement should not be received into evidence for any purpose." *Bailey*, 952 So. 2d at 237 (¶27). That is, if the witness admits that he made the prior statement, the written statement should not be admitted. *Brown v. State*, 682 So. 2d 340, 345 (Miss. 1996). Thus, the fact that the Bogran letter was introduced into evidence suggests that it was admitted as substantive evidence, not just for impeachment.

¶62. Regardless of the evidentiary status of the Bogran letter, we conclude that there was sufficient evidence for a jury to find that, between 1960 and 1970, Valley "knew or in light of reasonably available knowledge should have known about the danger" inherent in the use of silica in sandblasting operations, even as it related to a so-called bystander such as Howard. Miss. Code Ann. § 11-1-63(c)(i). Valley's argument seems to be that while perhaps it knew enough to have had a duty to warn persons who were directly engaged in sandblasting, it did not know enough to warn persons such as Howard, who merely worked in close proximity to sandblasting operations. However, we cannot conclude that this fine

---

[18] At trial, plaintiff's counsel argued that a different letter written by Bogran was admissible as a statement against interest. *See* M.R.E. 804(b)(3). However, counsel ultimately withdrew his request to introduce that letter into evidence, and it was marked for identification only.

distinction can serve to limit Valley's duty as a matter of law. We reiterate that Howard was not a "bystander" in the sense of a random passerby. He worked close enough to the sandblasting that his working conditions were extremely dusty and he "ate a lot of sand." Given that there was sufficient evidence that Valley was aware of a relationship between sandblasting and silicosis, we conclude that there was sufficient evidence for a jury to find that Valley knew or should have known that silica was a danger to persons working in such close proximity to sandblasting.

### V.     The trial court did not err by submitting the issue of punitive damages to the jury.

¶63.   "[P]unitive damages are not favored in the law and are to be allowed only with caution and within narrow limits," i.e., "only in extreme cases." *Tideway Oil Programs Inc. v. Serio*, 431 So. 2d 454, 460 & n.1 (Miss. 1983). Therefore, punitive damages are not recoverable unless the plaintiff "prove[s] by clear and convincing evidence that the defendant . . . acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(a). "In determining the propriety of submitting the issue of punitive damages to the jury, the trial court decides whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard." *Doe ex rel. Doe v. Salvation Army*, 835 So. 2d 76, 79 (¶6) (Miss. 2003). Valley argues that the trial court erred by submitting the issue of punitive damages to the jury because there was insufficient evidence to support such a finding.

¶64.   Based on the evidence already discussed, we conclude that the trial court did not err

in submitting the issue of punitive damages to the jury. As noted in the preceding section, the jury heard evidence that Valley placed no warning on its sandbags even though silicosis had been a known danger of sandblasting for decades. Thus, this was not a case in which a defendant provided some warning that was ultimately deemed inadequate. Rather, the evidence permitted an inference that Valley did nothing at all to warn of a known and deadly risk. Viewing the evidence in the light most favorable to Dorothy, *see Stewart v. Gulf Guar. Life Ins.*, 846 So. 2d 192, 202 (¶40) (Miss. 2002), a reasonable trier of fact could have found that Valley's conduct evidenced a reckless disregard for the safety of others. Accordingly, the trial court did not err by submitting this issue to the jury.

### VI. *The trial court was not required to remit the award of punitive damages to $0.*

¶65. Valley next argues that punitive damages cannot be awarded against it because it has a net worth of zero. In support of this argument, Valley introduced into evidence the liquidation plan and the final decree from its federal bankruptcy proceeding. Valley relies on Mississippi Code Annotated section 11-1-65(3)(a)(vi), which provides that for a defendant with a net worth of less than fifty million dollars, "no award of punitive damages shall exceed . . . [t]wo percent . . . of the defendant's net worth."

¶66. In response, Dorothy argues that Valley's net worth is not really zero because "Valley has massive assets in the form of multiple insurance policies." However, the defendant's net worth must "be determined in accordance with Generally Accepted Accounting Principles" (GAAP), Miss. Code Ann. § 11-1-65(3)(b), and Dorothy presented no evidence that insurance policies are treated as assets under GAAP. *See In re Miss. Medicaid Pharm.*

*Average Wholesale Price Litig.*, 190 So. 3d 829, 846 (¶41) (Miss. 2015) (opinion of Chandler, J., joined by Kitchens and King, JJ., affirming). Accordingly, we agree with Valley that its net worth is zero for purposes of the statutory cap on punitive damages.

¶67. Based on its net worth of zero, Valley argues that punitive damages cannot be awarded against it because two percent of zero is zero. However, the Mississippi Supreme Court previously reached a different conclusion. In *Canadian National Railway Co. v. Waltman*, 94 So. 3d 1111 (Miss. 2012), the Court stated that section 11-1-65(3)

> merely establishes that net worth is considered—not that it is solely considered—in determining the amount of punitive damages, and it is used to calculate the statutory cap for punitive damages. *We do not see how a statutory cap based on net worth suggests that there is a minimum net worth, such as zero, that will "cut off" the award of punitive damages. Hence, [a company] potentially could be liable for punitive damages, even if it were determined that the company presently has a negative net value.*

*Id.* at 1119 (¶22) (emphasis added).

¶68. Valley argues that "with all due deference to the Mississippi Supreme Court, *Waltman*'s consideration of the statutory cap on punitive damages was pure dicta" because "[t]he issue before the Court was personal jurisdiction, as opposed to any damage award." While it is true that the Supreme Court did not apply the punitive damages cap in *Waltman*, its interpretation of the statute was part of its analysis of whether the plaintiffs' allegations were sufficient to justify piercing the corporate veil and to establish a prima facie case of personal jurisdiction. *See id.* at 1119-20 (¶¶22-24). Exactly how significant the point was to the Court's analysis is unclear, but we do not believe that its interpretation of the punitive damages statute can be dismissed as mere "dicta."

¶69. Although neither party cited the case, we note that only three months after *Waltman* handed down, the Supreme Court applied the punitive damages cap in a case in which the circuit court found that the defendant had a net worth of zero. *See Coleman & Coleman Enters. Inc. v. Waller Funeral Home*, 106 So. 3d 309, 319-20 (¶¶30-33, 35) & n.9 (Miss. 2012). In that case, the Supreme Court affirmed the circuit court's post-trial reduction of punitive damages to $0, but the Court did not mention *Waltman* or address whether the reduction was required by the statute. Rather, the Court only held that the plaintiff had waived any objection to the trial court's order by failing to introduce evidence that the defendant had a positive net worth. *See id.* Because *Coleman & Coleman Enterprises* was decided based on principles of waiver, we cannot conclude that the decision overrode *Waltman*'s express statement that our punitive damages statute permits an award of punitive damages against a defendant with a negative net worth.

¶70. Valley's argument that the punitive award must be reduced to $0 is consistent with the language of the punitive damages statute. However, we are bound to follow Mississippi Supreme Court precedent. Accordingly, under *Waltman*, we conclude that the trial court did not err by denying Valley's motion to reduce the punitive award to $0.[19]

---

[19] Valley also makes a cursory argument that the punitive award should be reversed and rendered because it does not serve the purpose of punitive damages. "[T]he primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others . . . ." Miss. Code Ann. § 11-1-65(1)(e); *see also Tideway Oil*, 431 So. 2d at 460 ("[Punitive] damages are assessed as a warning and example to deter not only the offender but others similarly situated from committing like offenses in the future."). Valley argues that the punitive award in this case serves no specific deterrent purpose because it is bankrupt and out of business. It also argues that the award serves no general deterrent purpose because there is no "evidence of any manufacturer presently selling sand without a warning label." However, Valley does not cite any authority holding

### VII. The trial court correctly applied the apportionment statute and the noneconomic damages cap.

¶71.   As noted above, the jury found total economic damages of $165,615.73; noneconomic damages of $1,034,384.27; and damages for loss of consortium of $500,000. The jury also assigned thirty-five percent fault to Valley. Based on these findings, the trial court entered judgment for Dorothy for economic damages of $57,965.51; noneconomic damages of $362,034.49; and damages for loss of consortium of $175,000. *See* Miss. Code Ann. § 85-5-7(2) (Rev. 2011). The trial court concluded that the statute capping noneconomic damages at $1,000,000, *see* Miss. Code Ann. § 11-1-60(2)(b), did not require a further reduction because the judgment awarded Dorothy noneconomic damages, including for loss of consortium, of only $537,034.49.

¶72.   Valley argues that the trial court applied the relevant statutes in the wrong order. Valley believes that the court first should have applied the $1,000,000 cap on noneconomic damages and then reduced that amount based on Valley's percentage of fault. Had the trial court done so, Valley would have been liable for a total of only $350,000 in noneconomic damages. This is an issue of statutory interpretation, which we review de novo. *Conrod v. Holder*, 825 So. 2d 16, 18 (¶7) (Miss. 2002).

¶73.   Section 11-1-60(2)(b) provides that "in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than One Million Dollars ($1,000,000.00) for

---

that punitive damages may not be awarded against a defunct entity. Moreover, the purpose of punitive damages is to deter not only identical misconduct but all "*similar* misconduct." Miss. Code Ann. § 11-1-65(1)(e) (emphasis added). Even if no company today sells silica sand without a warning label, an award of punitive damages has the potential to deter similarly reckless conduct in other contexts.

noneconomic damages." The statute further provides that "[i]t is the intent of this section to limit all noneconomic damages to the above." *Id.* Section 85-5-7(2) provides that "the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault." We conclude that the circuit court's judgment is consistent with both of these statutes.

¶74. First, as to section 11-1-60(2)(b), the judgment does "not award the plaintiff more than One Million Dollars . . . for noneconomic damages." In its verdict, the jury *found* that Howard/Dorothy had suffered noneconomic damages in excess of $1,000,000, but a jury's finding is not the same thing as an "award." *See Tucker v. Marcus*, 418 N.W.2d 818, 823 (Wis. 1988) ("[T]he jury's finding that there had been injury suffered, and ascertainment of a sum which would fairly compensate the respondent for the injury suffered, did not constitute an 'award' of actual damages. An 'award' represents a remedy recoverable in accordance with an order for judgment."); *accord Lira v. Davis*, 832 P.2d 240, 245 (Colo. 1992). The noneconomic damages apportioned to Southern Silica and MSIC should not be viewed as part of the "award" because neither of those entities was a party at trial, and the jury's findings that their conduct caused damages do not give rise to any liability. Rather, the damages apportioned to those two entities served only to reduce Valley's liability.

¶75. The trial court's judgment also complies with section 85-5-7(2) because it holds Valley liable for precisely thirty-five percent of the total noneconomic damages found by the jury. Miss. Code Ann. § 85-5-7(2). Accordingly, pursuant to the judgment, Valley is "liable

43

only for the amount of damages allocated to [it] in direct proportion to [its] percentage of fault." *Id.*

¶76.    For the above reasons, we conclude that the trial court properly applied both section 11-1-60(2)(b) and section 85-5-7(2) and that no further reduction in the judgment was required.[20]

### VIII.    *The award of attorneys' fees must be vacated and remanded for a determination based on appropriate findings of fact and conclusions of law.*

¶77.    "Where punitive damages are awarded by the jury, attorneys' fees are justified." *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 486 (¶40) (Miss. 2002). As we have upheld the award of punitive damages, we also conclude that the trial court did not err by awarding attorneys' fees to Dorothy.

¶78.    "The fixing of reasonable attorneys' fees is a matter ordinarily within the sound discretion of the trial court[.]" *Id.* at (¶39) (quoting *Gilchrist Tractor Co. v. Stribling*, 192 So. 2d 409, 418 (Miss. 1966)). "The reasonableness of an attorney's fee award is determined by reference to the factors set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct." *Id.* at (¶40). "These factors are sometimes referred to as the *McKee* factors." *Id.*

---

[20] A federal district judge similarly held that our comparative negligence statute, Miss. Code Ann. § 11-7-15 (Rev. 2004), should be applied before the statutory cap on noneconomic damages, rather than vice versa. *See Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09CV169KS-MTP, 2012 WL 1596723, at *11-*12 (S.D. Miss. May 4, 2012) (Starrett, J.). In that case, the court reduced noneconomic damages from $2,500,000 to $1,500,000 based on the plaintiff's forty percent comparative fault and then to $1,000,000 based on the statutory cap. The court rejected the defendant's argument that noneconomic damages should have been reduced to $1,000,000 based on the cap and then to $600,000 based on the plaintiff's comparative fault. *See id.*

44

at 486-87 (¶40); *see McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982)).  The trial court may also exercise its own judgment as to an appropriate fee award, based on the court's experience and observation.  *See* Miss. Code Ann. § 9-1-41 (Rev. 2014).

¶79.    In the court below, Dorothy initially requested an unspecified amount of attorneys' fees.  It appears that Dorothy subsequently supplemented her motion by providing detailed records of her attorneys' time to the trial judge for in camera review.  Dorothy's supplement apparently requested $212,312.50 in fees.  However, the supplement does not appear to have been filed with the court, and it is not a part of the record on appeal.  Valley filed an amended response in opposition to Dorothy's request for attorneys' fees and raised various objections to the requested amount.  The trial court subsequently granted Dorothy's motion for attorneys' fees in an order that simply stated as follows:

> THIS CAUSE having come on to be heard on Plaintiffs Motion for Award of Costs, Attorneys' Fees, and Other Relief.  The Court, having reviewed the pleadings and arguments of the parties, and being otherwise advised in the premises, finds that the motion is well taken and should be granted.  The Court finds that $212,312.50 is reasonable in relation to the results obtained in this case.
>
> IT IS, THEREFORE, ORDERED AND ADJUDGED that Plaintiff's Motion for Award of Costs and Attorneys' Fees is Granted in the amount of $212,312.50 plus an interest rate of 8% per annum until fully paid.

The trial court made no further findings concerning the reasonableness of the fee or Valley's objections.

¶80.    The trial court's one-page order would be insufficient to justify an award of attorneys' fees of this magnitude even if the record contained counsel's time records, which it does not.  Our Supreme Court has expressly mandated that a trial court's determination of reasonable

45

attorneys' fees must "consider the eight factors enumerated in Rule 1.5 of the Rules of Professional Conduct." *BellSouth Pers. Commc'ns LLC v. Bd. of Supervisors of Hinds Cty.*, 912 So. 2d 436, 448 (¶39) (Miss. 2005). At least when a party requests a fee award as substantial as in this case, "trial court judges must follow the appropriate procedure and make the requisite findings of fact necessary to insure a losing litigant is only made to compensate his adversary for fees and expenses which were reasonably incurred." *Id.* The trial court in this case failed to make any such findings. Accordingly, the award of attorneys' fees must be vacated and remanded to the trial court, and on remand the trial court should determine and award reasonable attorneys' fees based on findings of fact and conclusions of law related to the *McKee* factors. *See id.*; *Cook*, 832 So. 2d at 487 (¶¶41-42).

## CONCLUSION

¶81. For the foregoing reasons, we affirm the November 28, 2012 judgment of the circuit court in all respects. We vacate and remand for further proceedings consistent with this opinion only with respect to the February 27, 2014 order granting attorneys' fees.

¶82. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, IS AFFIRMED IN PART AND VACATED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., FAIR AND GREENLEE, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, J.**

**ISHEE, J., DISSENTING:**

¶83. With respect to the majority, I must dissent on the issue of Dorothy's standing. After

46

Barnett's passing, Dorothy pursued Barnett's claims under the wrongful-death statute. The wrongful-death statute provides for a decedent's statutory heirs to recover "all the damages of every kind to the decedent . . . [including] property damages and funeral, medical, or other related expenses incurred by or for the deceased as a result of such wrongful or negligent act or omission or breach of warranty." *In re Estate of England*, 846 So. 2d 1060, 1068 (¶24) (Miss. 2003) (quoting Miss. Code Ann. § 11-7-13 (Supp. 2002)).[21] The wrongful-death statute allows for recovery by heirs regardless of whether an estate has been opened for the decedent. *Id*. at 1065-66 (¶14) (quoting Miss. Code Ann. § 11-7-13).

¶84. Certain recoverable damages not specifically allotted by the wrongful-death statute are attainable through Mississippi's survival statute, which "allows an estate administrator to commence and prosecute any personal action which the decedent might have commenced and prosecuted . . . [and] [a]ny recovery from such action becomes an asset of the estate . . . ." *Id*. at 1068 (¶21) (citing Miss. Code Ann. § 91-7-233 (Rev. 1994); Miss. Code Ann. § 91-7-91 (Rev. 1994)).[22] Implicit in recovery under the survival statute is the existence of a decedent's estate and an administrator of the estate. As stated in *Long v. McKinney*, 897 So. 2d 160, 174 (¶60) (Miss. 2004): "In the event the litigants wish to pursue a claim on behalf

---

[21] The applicable version of the wrongful-death statute for this case was updated in 2004. Nonetheless, the language from the 2002 version of the statute as cited in *Estate of England* is identical to the 2004 version save for the addition of the phrase "or of any unborn quick child" to the list of persons for whom heirs may recover damages. All references made to the statute in *Estate of England* remain viable for this analysis.

[22] The language used in sections 91-7-233 and 91-7-91 remains untouched at present. Hence, the supreme court's references to both statutes in *Estate of England* are also applicable to the instant case.

of the estate of the deceased, such estate must, of course, be opened and administered through the chancery court."

¶85. Furthermore, the wrongful-death statute recognizes the "one-suit rule," mandating that only one suit shall be commenced for recovery of damages for the decedent. *Estate of England,* 846 So. 2d 1060, 1068 (¶¶24-25) (quoting Miss. Code Ann. § 11-7-13). In that vein, the Mississippi Supreme Court has made it clear that an "estate administrator [may] assert both a wrongful[-]death action and a survival action" in one suit. *Id*. at 1069 (¶29) (citing *Wilks v. Am. Tobacco Co.*, 680 So. 2d 839, 840 (Miss. 1996)).

¶86. In the present case, Barnett instituted the action himself at the commencement of the suit. However, upon his death, Dorothy filed an amended complaint wherein she substituted herself in his place to pursue wrongful-death damages. An estate was never opened. Hence, it goes without saying that neither Dorothy nor any other party was ever an administrator or executor of Barnett's estate. By way of the amended complaint, Dorothy's only capacity for recovery became by and through the wrongful-death statute. As such, Dorothy was not entitled to recoup any hypothetical survival damages – only wrongful-death damages.

¶87. At the close of the trial, the jury determined that it could not attribute Barnett's death to silicosis either by cause or by contribution. Accordingly, while Dorothy had standing to recover wrongful-death damages, she was not awarded any. The jury only awarded survival damages. Since an estate was never opened for Barnett, there was not a party to the action with standing to recover the survival damages awarded. As such, I am of the opinion that we are without authority to dispose of this case in any way but to reverse and render the

48

judgment as void since no one and no entity possessed the proper standing to recover the survival damages awarded.

**CARLTON, J., JOINS THIS OPINION**.